We'll hear the next case, and I think that Mr. McLaughlin is actually not on that case, so you can... Good morning, Your Honor. Jeremy Lieberman. I wanted to ask you at the outset, are you asking for rebuttal time? Yes, Your Honor. We'd like to reserve three minutes. Three minutes for rebuttal. Okay, thank you. May it please the Court, Jeremy Lieberman from the Pomerantz LLP on behalf of Appellants. Your Honor, this case, we believe, is really an open and shut case in favor of plaintiffs, and we were quite surprised to read and view the lower court's opinion. Prior to the class period, Deutsche Bank had been fined $9 billion for various crimes, with respect to LIBOR manipulation, with respect to underwriting of mortgage-backed securities, and with respect to the avoidance of U.S. sanctions regulations. An employee, which had been cited in the criminal complaints therein, had described Deutsche Bank's culture as one of a culture of criminality. Deutsche Bank, during the class period, sought to convince investors. They had completely turned the page, and they now had a very robust system of internal controls for know-your-customer compliance and anti-money laundering compliance as well. What we've learned, Your Honor, is that those compliance facilities were completely insufficient. Not only were they insufficient, they actually aided and abetted the money laundering to the tune of billions. Weren't the regulators involved with them after they had so-called turned the page, that they really hadn't turned the page and the regulators still were pursuing them? That's exactly the case. The regulators were pursuing them, but undisclosed. The regulators were investigating them. So we have, even going back to 2002, with respect to money laundering, regulators come into Deutsche Bank, they do a review, and they say, you're not compliant. There are severe deficiencies with respect to your AML and KYC procedures. In terms of the severe deficiencies, why aren't the severe deficiencies just issues of mismanagement rather than material misrepresentations as a matter of law? That's an interesting thing, an artifice the Court created. When you make a representation regarding your procedures, if those are deficient, there's no category of, quote-unquote, mismanagement. If you're speaking about your KYC and AML procedures, and they are severely deficient, and management has reason to know they're severely deficient, whether or not it falls into mismanagement is simply is not. But as I understand the relevant statute, it's not simply to provide a violation for deficiencies. What you're really looking at are material misrepresentations that would mislead investors to think that the company's in a better position than it is. In the context of your complaint, you've got to be fairly specific about what the material misrepresentations are. Go ahead. Here we are being specific. The Federal Reserve is coming in 2002, 2007, later on in 2012, consistently saying in 2012, they're saying, for over a decade, we've been warning you that you know your customer policies and your AML policies are sorely deficient. Where do they, at any point in those reports that you mentioned, where do they make note or reference specifically to anti-laundering violations? If you go to 2002, 2007, 2012, 2013, where can I find the phrase anti-money laundering? Well, certainly we find- In any of those reports. We do find that the regulators, the New York Department of Financial Services found that Deutsche Bank suffered from widespread and well-known weaknesses in its KYC process for onboarding new clients. Yet, that's KYC. Yet, despite Deutsche Bank's substantial history of regulatory violations placed on firm notice that the schemes like mirror trading might occur. You have the regulators saying you've been on notice for over a decade of these weaknesses. Is the answer to my question that you do not find the words anti-money laundering violations in any of those reports? Your Honor, we're going to get to that specific point in a moment. What's the answer? I believe they were, Your Honor. I believe the subject of the 2013 letter from the Federal Reserve to Deutsche Bank in 2013 did reference KYC and anti-money laundering. Maybe you can confirm that on rebuttal. We will confirm that, Your Honor. And we do have the Department of Financial Services saying that the ultimate responsibility is on management with respect to these violations. You have an internal audit in 2012 that did deal with money laundering issues. That, Your Honor, we did allege. And those in 2012 did raise that to management and found, again, severe material weaknesses. We have that back in — and when it comes to — with respect to the internal controls and money and weaknesses, which — You look at that same financial services report — well, the consent order. Let me get to that. Between the Deutsche Bank and the Department of Financial Services, the order says that, and I'm quoting, and this is on the appendix at 841, no concerns relevant to the suspicious trading activities were ever escalated out of Moscow, in part because, and I quote, compliance topics generally were not discussed during regular business calls or meetings between the Moscow and London offices. So, Your Honor, we have a scenario where they're being told by the Board of Governors of the Federal Reserve that you have actually the worst internal control processes of any bank we've seen, of any of your peers. And then they're being told in an internal audit that your Russian division is the worst of any other division in this bank. And so they know that in Russia, they have actually the worst — it's not only the worst of all its peers, which is the internal controls generally, you've got the worst of the entire division. That means it's the worst division in the entire world of all its peers. And all that — and I appreciate all that. What I'm struggling with is this question of we've got these issues in terms of internal controls and issues of money laundering, but my understanding is it's got to be tied to the statements. And what you're tied to are these statements I think some courts may have considered sort of puffery. I think the district court looked at it that way, that they're saying, oh, we've got X, Y, and Z in place. And none of those statements sort of say we will have no corruption or we will have no money laundering. All of them seem to be sort of aspirational in nature. Am I wrong about that? Your Honor, we do disagree. They say they have effective, robust anti-corruption practices. They say they are in compliance with the law. They say they have effective risk management. They're dealing with — there's numerous statements made regarding KYC and AML, and yet they're not disclosing that the Federal Reserve is raising issues about that very topic. Are they supposed to disclose that they have the worst Russian bureau of any bank in the country? I mean, you know, they're doing business. They're not affirmatively misrepresenting what has happened. They're giving their opinion. It seems to me there may be — I think quite clearly there was mismanagement going on. I mean, they weren't meeting the standards that the regulators were insisting on. But my question there is what were the statements other than just normal kind of talking about, well, we have standards in place now. We have measures in place. And there's nothing false about that. They did have measures and standards in place. They weren't working very well or as much as you would like. They say that they're effective. They say they're robust. Not only that, and that's false. That's a false statement. They're not just saying we have them in place. They're measuring them. An opinion. Well, it's an opinion. And so Omnicare addresses an opinion. And Omnicare says if you have reason to know of a contrary opinion, you better let investors know. And so if you say you're in compliance with laws, another statement made by Deutsche Bank, that's an opinion. If you know the federal government Omnicare teaches us, if you know you have a contrary opinion about the federal government, you must disclose that to investors. Where's the disclosure of the December 2013 letter saying for over a decade we've repeatedly warned you about your procedures and about your internal controls. It's unacceptable that you haven't remediated. Not only that, there's no disclosure to investors. So you're giving the view that you have proper internal controls. You're giving the view that you have proper KYC practices. You're being told repeatedly by regulators that your internal controls and your practices, internal audits are telling you that you actually have faulty controls, and yet you're not disclosing it. That's where the rubber meets the road, particularly when we have a scenario where the company before the class period was severely criticized for its internal controls and for corrupt practices. Can I move you to the CIANTR prong? And I'm having trouble seeing where the CIANTR is. So CIANTR can be established by alleging facts to show either that defendants had motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness. Can you show me motive and opportunity to commit fraud? Motive and opportunity, the NYDFS looks to motive and opportunity, and they say actually that the motive and opportunity was if you would shut down the mirror trading scheme in Russia, you actually wouldn't have any business. That was a primary source of business. Do you need to assert how or show how the individual defendants personally benefited from making the alleged misrepresentation? Well, 10 billion in transactions coming out of Russia in a money laundering scheme, the NYDFS saying that had they stopped that, had they had proper New York know-your-customer controls, they would have lost significant business. That is the motive and opportunity here, Your Honor. But where is the allegation that links, and I understand that there are really three defendants that had been served, Mr. Schenck, Mr. Kryan, and Mr. Jane. Where is it that any of these particular individuals knew about the reliance on the money laundering profits and then therefore either certified or financial statements or made statements that were contrary to information they knew about the money laundering and other activities? Again, it's really the Ma case that just came out in the Second Circuit and the JNCO Solar case. In both instances, the governments are warning or there's warnings made to governments by senior management, not necessarily the executives, with respect to violations of law. And here we have similar warnings, and there the court held. There's warnings, but I guess the question is what do we know about what these individuals knew about the warnings and the link between the warnings and the public statements that were made by the company? It seems to me that isn't that the nexus that really has to be sort of drawn here? So we do know that there was responsibility as far as being on the management board was for risk compliance. We do know that the DFS and other regulators warned, actually fined Deutsche Bank during the class period regarding anti-money laundering concerns, and it simply strains, as the court ruled in Ma and as the court ruled in JNCO Solar, it simply strains any credibility to argue that somehow the executives didn't know about this. To say that the Federal Reserve tells you for a decade we've been warning you about your internal controls, and yet you haven't responded and it's unacceptable, and to say that somehow Jane doesn't know that, Your Honor, that simply defies any common sense and defies Second Circuit precedence here. What the Second Circuit says is not only does it defy whether or not the executives knew, but there's the subject of corporate scienter. The New York DFS states they identify clear warnings repeatedly ignored and unaddressed by senior management. What else can that say? But there were warnings throughout the class period made to senior management, never addressed. And where are those warnings stated to investors? All they're telling investors is that we have good New York customer controls in place. You have three minutes in rebuttal. Would you like to finish off your sentiment now? And then you'll have three minutes. Sure. Finish your thought. The DFS similarly stated that the serious compliance deficiencies spanned Deutsche Bank's global enterprise. And so you just have this finding by the DFS. Management's being warned. It spans the enterprise. You find with respect to the sanctions evasions, they found that deliberate systematic evasion of U.S. sanctions as a matter of bank policy. That's bank policy. That infiltrates throughout the corporation. To find a bank that's been fined $675 million by over five regulators throughout the class period, and to find, well, gee, the senior executives didn't know here. It's just mismanagement. This isn't mismanagement. This is fraud, and this is the allowance of fraud to occur. Thank you. We'll remain. Thank you. I understand the law that says that general statements about reputation, integrity, and compliance with ethical norms are viewed as immaterial puffery. But when you look at the alleged misstatements here, Deutsche Bank says that it had robust controls. It's not aspirational. It says it had robust controls to prevent money laundering, that its compliance management system had been, and I'm quoting, been achieving good results for years. How do these statements, which go to past effectiveness of Deutsche Bank's internal controls, how are they mere puffery? One, they have to be taken in context. And, two, they have to be made with scienter. With respect to context, the bank said in every annual report that risk management techniques have not been and may not be in the future fully effective. Plaintiffs elided that quotation when they cited to the document. Judge Bolton, of course they said none of these measures are absolute, none of them assure and guarantee perfection. Plaintiffs elided that quote from when they cited the document. Plaintiffs first. They also say, I mean, you have the statement in the appendix of 112 that Deutsche Bank's personnel, and I quote, comply with all laws and regulations. I was just going to point that out. I had to find where that was said. It's not said in any annual report. It's not said in any press release. It's not said at any press conference. It's not said in any published document of the bank cited in the complaint. Where it is said, and in paragraph 112 of the complaint, they don't source that quote. I found it. It's in the bank's internal code of ethics. That's the only place that statement is made. And they elided the prior sentence, which says, quote, all Deutsche Bank employees are expected to comply with the laws. That's elided. That's not a published representation of the bank. That's an internal aspiration. It's on page 1062 of the appendix under the heading our values and beliefs. With respect to the DFS, New York State Department of Financial Services, 22 pages of their briefs to this court cite that. Over a half a dozen times, counsel mentioned it in argument a moment ago. That settled negligence-based claims only. And as the chief judge pointed out, when the matter percolated to a management level within Deutsche Bank, that consent order expressly finds that Deutsche Bank reported, self-reported to the regulators, commenced an investigation, and in a serious and timely fashion implemented remedial measures. Chief Judge Katzmann, as you stated for this court in Slayton v. American Express, quote, ordering an investigation as soon as it learned of the issue was a prudent course of action that weakens rather than strengthens scienter. What we have here is a situation where the bank made statements, aspirational, just like in Chill v. General Electric, where General Electric said, we have robust internal controls. And then there was a problem. This court said, the statements about the efficacy of financial controls are not adequate to state a securities fraud claim, regardless of the accuracy, unless plaintiffs allege the requisite scienter. And your point is spot on correct. There are no allegations of scienter as to any of the individuals that could be imputed to the corporation. There is no concrete benefit, no motive established. And absent that, the circumstantial evidence has to be greater, and there is none. What we have here is not a situation where the bank had no controls and said that it did. The bank's controls were imperfect. And as this court said, playing catch up with internal controls is not securities fraud. Magnum Hunter. So this mirror trade scheme apparently went on for about five years, from 2011 to 2015. Is that right?  That's what's alleged. And during that period of time, there were various regulatory actions being taken against the bank by regulators, domestic and international, correct? The German Federal Bank accused them of tax fraud. There were warnings by various regulators. There was a letter from the Fed Reserve, New York Fed, outlining lack of appropriate controls. And so on during this period, really during the period of the mirror trade schemes. Were any of these particular events that were occurring in the regulatory arena public? Were they known to the public at all? Or were these all private, between the bank and the regulators? Or were there public announcements about the regulations? Every one of them was publicly announced. Every one of them was either announced by the regulatory authority, South Africa, Dubai, or by the bank. What I'm trying to do is figure out whether an investor would be on notice of problems, continuing problems, during the mirror trades of the controls at the bank. Of course. And controls are not perfect, and there was no representation they would be. Can you talk about what's the total mix of information that was out there for the investors? The mix of information is this is an international bank. And just like UBS had issues with controls, and those claims were dismissed and affirmed by this court, it is a constant game of catch-up. Where you're in a changing technological environment, internal controls are constantly leapfrogging with improper conduct. And the bank is simply, in reality, improving. Catch-up point. What I'm looking at is what would the investor think from all the available information that was available from 2011 to 2015? What would they be aware of? In other words, there's a difference, it seems to me. I'm throwing you a softball here, actually. There's a difference, it seems to me, where there are matters going on privately that are not public that really show that the company is failing in its controls. And the public has no idea about any of that and continues investing, buying stock, and so forth. But the information is out there as part of the mix. You're exactly right. And a reasonable investor would understand that this bank had had issues, that this bank had had settlements, that this bank had paid regulatory fines, and that was in the public domain. Plaintiffs, the first paragraph of their brief to this court demonstrates the problem with their case. They say that it is manifest because, the wrong is manifest because the violation was later announced. Your Honor has made clear that this court does not permit plaintiffs to proceed based on fraud by hindsight. They have to allege specific facts, the PSLRA. They have to demonstrate a strong inference that at the time the statements were made, they were known to be false. JNCO Solar, the case that the counsel cited, is not a 34-act case. It's a 33-act case with a public offering. There was a prospectus put out in May of 2010, and in June 2010, the directors knew that all those statements had been false because they filed with the Chinese environmental authorities a report noting the history of their existing violations, existing 30 days ago, the time of the public offering. We don't have a case like that. This is not a 33-act offering where there are disclosure obligations. 10b-5 is not a disclosure statute. It's an anti-fraud provision, and there is no fraud alleged by any individual. There is no corporate fraud alleged. There is no clear allegation that at the time any of these aspirational statements were made, they were not believed, and this court has been very clear that the fact that later on there is a violation when the corporation previously referred to having robust controls or having complied with law and a number of the other statements, we've marshaled the seven decisions of the circuit affirming dismissals of cases just like this. Hindsight doesn't do it, and that's all this case is. Thank you. Thank you. Your Honor, I was going to ask, where was the evidence that they had known about these deficiencies prior to the end of the class period? And as Your Honor had previously stated, there was a raid in Germany of 500 police. My question is looking at the reports that you cited, 2002, 2007, 2012, 2013. Where is anti-money laundering cited specifically? So, Your Honor, I don't have those reports. I do have the DFS stating that the money, clearly the DFS is saying they knew about these issues. I think the inference is those letters raised those. If those letters didn't raise those, clearly the DFS concluded that management knew about it, and management clearly knew about the 500 police officers coming into the German headquarters and throwing out the head of the anti-money laundering unit. He was actually arrested, and so he's arrested in 2012. They're told that your biggest weak spot is Russia. That's really where you're the worst of anyone here. You're the worst of 28 peer banks. Your worst division is Russia, and nobody goes into Russia and sees what's happening. Actually, the Russian government in Moscow is raising issues regarding $10 million in transactions with Westminster Capital. There's another issue with Ergo Invest, and Moscow's raising those issues. It's a 2014 internal audit report on Moscow saying there's severe weaknesses. Throughout the complaint, there's issues of severe, well-known, widespread, and bank policy throughout the class period. These are allegations not made by plaintiffs, but by regulators, and yet the district court here found that there was no misstatement, no scienter. It's simply we wouldn't see how in the case of Ma, where there was one meeting with a regulator, where there were issues raised, no even misstatements really regarding counterfeit items that were identified. In the court, they found that there was a misstatement with respect to the IPO, and there was scienter. Let me ask you this. Going back to this material misrepresentation of scienter, Mr. Gilman was talking about that some of the quotes of misrepresentation seem to be, in his view, I'll describe his view, sort of cherry-picked and don't take things out of context. So the question then becomes taking in context what you consider to be the material misstatements and the scienter. I mean, try to link that up. Can you link that up succinctly for us? Because I'm still struggling with exactly what the material misrepresentations are and then what the scienter in terms of who knew what when. So when they made that statement, they knew it was false, which seems to be where we're supposed to be. Go ahead. The material misrepresentations are saying they have robust and effective anti-money laundering practices. The material misrepresentations are that they're complying with law. Those are the material misrepresentations. And there's numerous. There's dozens of statements made throughout the class period. Those have been found by Obamacare. Okay, so move on to scienter. Move on to scienter. Finding by the NYDFS, finding by the Board of Governors, German authorities, all finding widespread, matter of fact. I guess when I think of scienter, I'm thinking of particular individuals, what they knew at the time the statements were made. What we know is that senior management knew about the issues. Senior management was on reference. So the question is, is that enough to infer that somebody at the corporation who had authority over the statements. Well, it's not somebody. We've got three people who are named here, Shanker, Skank, Kryan, and Jane. So how are you linking up these three individuals to material misrepresentations so that, in essence, that they have scienter about the statements being false? So first of all, because it was under their oversight and court has recognized that it would be simply under Ma. Under Ma, you didn't have the executive at the meeting either. There was no allegation that the person making the statement knew. The allegation was it was such a key issue and it was raised high enough that it was simply implausible that it wasn't related to management. And we don't only need that. There is something called corporate scienter recognized by the Wells Fargo case. I don't need to show you that Jane got the 2013 report or that Jane saw the 2014 audit. I have to show you this was pervasive enough that this had gone up enough through senior management, as the DFIS has told us, that it would be implausible that they didn't know. And that is the allegation, Your Honor, that's recognized in the Second Circuit and that there's misstatements here. And to find in a case where you have $675 million in penalties levied against a company, finding severe recklessness, finding fraud on all different types of issues by five different countries, and to find that somehow the bank didn't make a misstatement, investors somehow should have been aware, we think it would send a very bad message to the investing public and to corporations throughout, Your Honor. Thank you. Thank you both for your arguments. The court will reserve decision. We'll hear the next.